OPINION
{¶ 1} Appellant Lloyd Clark appeals (Case No. 2003 AP 07 0053) from the June 5, 2003, Judgment Entry of the Tuscarawas County Court of Common Pleas, Juvenile Division, granting permanent custody of Albert Blunt, Jr. to the Tuscarawas County Job and Family Services. Appellant Connie Blunt has filed a separate appeal (Case No. 203 AP 07 0055) from such entry.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellant Connie Blunt is the mother of Dakota Blunt (DOB 12/17/98), Christine Blunt (DOB 02/07/00) and Albert Blunt, Jr. (DOB 6/18/97) hereinafter referred to as "Albert." Appellant Lloyd Clark is the father of Albert Blunt, Jr.[1]
 {¶ 3} On November 8, 2001, the Tuscarawas County Job Family Services filed a complaint alleging that the three children were neglected and dependent children. As memorialized in a Judgment Entry filed on November 9, 2001, the three children, who since January 12, 2001, had been in the temporary custody of their maternal grandmother, Elaine Corbin, were placed in the temporary custody of Tuscarawas County Job Family Services. The children had been placed with their maternal grandmother by Tuscarawas County Job Family Services after the Agency received information that appellant Connie Blunt had gotten back together with Albert Blunt, her then husband, who had a history of domestic violence.[2]
 {¶ 4} An adjudicatory hearing was held on December 19, 2001. Pursuant to a Judgment Entry filed on December 20, 2001, the trial court granted the motion filed by Tuscarawas County Job Family Services to dismiss count one of the complaint, alleging neglect. Thereafter, appellant Lloyd Clark and appellant Connie Blunt changed their plea from a denial to an admission to the amended complaint. The trial court then found that the three minor children were dependent children pursuant to R.C. 2151.04 and ordered that the children remain in the temporary custody of Tuscarawas County Job Family Services.
 {¶ 5} Subsequently, on April 18, 2002, a motion for permanent custody was filed by Tuscarawas County Job and Family Services. Tuscarawas County Job and Family Services, in its motion, alleged that appellant Connie Blunt had substantially failed to make progress under her case plan since she had failed to secure stable housing, had, as indicated in a psychological evaluation, difficulty in providing appropriate parenting "given her particular mental health problems", and had continued contact with her husband, Albert Blunt, despite his repeated convictions for domestic violence. While Albert Blunt was appellant Connie Blunt's husband when the three children were born, he is not the biological father of any of the children. The motion further alleged that appellant Lloyd Clark, who was living with his girlfriend and four other children, "has engaged in case plan services; however, has been ambivalent about the reunification of Albert into his existing family" and was unable to provide the structure that Albert required. A permanent custody hearing was held on July 25, 2002. The following testimony was adduced at such hearing.
 {¶ 6} At the hearing, Dr. El Hage, a psychologist at Community Mental Healthcare, testified that he conducted a psychological evaluation of appellant Connie Blunt on May 2, 2001. As a result of his evaluation of Connie, Dr. El Hage concluded that she "had a personality disorder with borderline dependent traits" and that she suffered from depression. Transcript of July 25, 2002, hearing at 10. When asked about the diagnosis of "personality disorder with borderline dependent traits", Dr. El Hage testified that a person with such a diagnosis has a history of impulsive behavior, that negative consequences do not cause them to change their behavior and also engages in self injurious behavior. Transcript of July 25, 2002, hearing at 11. The following testimony was adduced when Dr. El Hage was asked whether his diagnosis would be consistent with someone who has been involved in a violent relationship, but maintained such relationship despite being injured:
 {¶ 7} "A. Yes.
 {¶ 8} "Q. Given that diagnosis with Miss Blunt, what concerns would you have with her ability to be a primary caretaker for three young children?
 {¶ 9} "A. I do believe that, you know, the characteristics, let me just say a couple of things about this, when I evaluated her what I had in mind is to determine whether the psychological difficulties she was experiencing were treatable. I mean if somebody went to counseling could that person benefit and make changes, and my conclusion was, as I have written down, is that the prognosis is guarded which means probably not, although I could not be definite, so I wanted her to undergo treatment, although I felt that the, her ability to make changes is not very good. Um, and to answer your question more directly, if a person is impulsive, and is unable to control that, and if a person is, the judgment is poor, they are not likely to be able to take care of themselves really well first, you know, and consequently unable to take care of people dependent on them, so there is a problem in that. The impulsivity, the poor judgment have to be addressed first in order for the person to be able to take care of others.
 {¶ 10} "Q. If there was to be any change of any kind through counseling and other treatment, is that something that would happen in a short term basis or is that a fairly long term prospect?
 {¶ 11} "A. That's a fairly long term job, but at the same time the prognosis still is not very good because there are other psychological factors that can weigh on that in this equation. The intellectual functioning, the psychological mindedness, and the ability to tolerate the frustration of therapy. I mean when people go through therapy mostly it's not fun, I mean there is a lot of work, a lot of confrontation, a lot of changes have to be made, so these characteristics are very crucial, so my impression was that it had been very difficult to make any changes." Transcript of July 25, 2002, hearing at 12-13. Dr. El Hage, on cross-examination, testified that he did not believe that a previous psychological evaluation conducted on Connie, which resulted in a diagnosis of schizo-affective disorder, was accurate.
 {¶ 12} Dr. El Hage also testified that he conducted a psychological evaluation of appellant Lloyd Clark on June 5, 2002, but that the test results were invalid since measures on the psychological tests indicated that, to an unusual degree, Clark was being defensive. Dr. El Hage testified that, based on his clinical interview with Clark, "there was no severe mental illness." Transcript of July 25, 2002, hearing at 16. However, based on the background information that he had obtained, Dr. El Hage believed that appellant Clark had a personality disorder. Dr. El Hage further indicated that he had specific concerns about appellant Clark's ability to provide care for his son, Albert.
 {¶ 13} Rebecca Wigton, a professional counselor and board eligible nationally certified counselor, also testified at the July 25, 2002, hearing. Wigton testified that she was working with Albert as well as his father, appellant Lloyd Clark, and also Tara Hopper, Clark's live-in girlfriend and the mother of his son "Little Dutch". Hopper's two children also reside with the couple. Wigton, who did three sessions in appellant Clark's home, testified that she was working towards reunifying Albert with appellant Clark, his biological father. Wigton, however, voiced concerns over discipline in the Clark home and also voiced concerns about appellant Clark's relationship with Tara Hopper. At the hearing, Wigton testified that Albert suffered from post-traumatic stress disorder and adjustment disorder "with mixed disturbances of emotions and conduct" and that he had high levels of stress. Transcript of July 25, 2002, hearing at 37. According to Wigton, Albert requires "consistent discipline, a unified parenting front, and lots of patience and attention, individual attention, " Transcript of July 25, 2002, hearing at 38. The following testimony was adduced when Wigton was asked whether she had concerns about the family's willingness to modify their home to meet Albert's needs:
 {¶ 14} "A. Um, yes, I think that, um, perhaps Mr. Clark's job inhibits him from, um, making further progress because he's not home a lot and one of the main concerns is his involvement with Ace's [Albert's] discipline, um, as Tara Hopper feels, um, it's not, she is the primary disciplinarian in the home, um, however, this being, Ace being not biologically related to her and often there's so much tension between the two of them that, um, she's requested, um many times in front of us that Mr. Clark be more involved in supporting her and his presence is one thing that inhibits him as well as, um, some feelings of guilt that he's admitted to feeling related to Ace's history and, um, and those things keep him from doing what he needs to do as a parent. So that would also take time to work through." Transcript of July 25, 2002, hearing at 38-39.
 {¶ 15} Wigton also noted that there was conflict between Tara Hopper and Albert, based on Tara's frustration and concern "over the situation regarding Ace[3] [Albert] and, um, Mr. Clark's withdrawal, um, from the situation." Transcript of July 25, 2002, hearing at 39. According to Wigton, Albert's presence in the home would continue to be a problem affecting the relationship between appellant Clark and Tara Hopper. Wigton testified that the first time she met appellant Clark and Tara, Tara complained "very loudly of the situation and what she had been through, but Mr. Clark avoided the situation and walked around us as much as possible." Transcript of July 25, 2002, hearing at 40. Wigton finally indicated that she had concerns regarding the placement of Albert into the Clark home and that, although both Tara Hopper and appellant Clark verbalized a commitment to make changes necessary to provide a positive place for Albert to be, "their effort has, and um, and works or actions have, um, contradicted their verbalizations, at times." Transcript of July 25, 2002, hearing at 42.
 {¶ 16} Sally Holmes, a case manager with the Kids Program at Community Mental Healthcare, testified that she has been involved with Albert since July of 2001 and that Albert has been involved in the three times a week counseling program. Parents are encouraged to become involved in the counseling and, as part of the program, sign a contract agreeing to be involved. Holmes testified that appellant Connie Blunt, for at least one of the counseling sessions, "brought in an extremely unkempt man with her who, um, smelled very strongly of alcohol." Transcript of July 25, 2002, hearing at 63-64. Holmes also testified that Connie brought other individuals to the sessions without prior approval to do so. Holmes testified that since Albert has been in foster care, there had been a big improvement in his behavior and his physical appearance that she believed that the improvement was due to the foster parents because "where Ace [Albert] is right now there are fewer parenting issues now." Transcript of July 25, 2002, hearing at 70. When asked whether Connie reacted in a positive way whenever Holmes addressed problems with her, Holmes testified that "most of the time she [Connie] reacted as if she didn't know what we were talking about." Transcript of July 25, 2002, hearing at 74.
 {¶ 17} Holmes further testified that, although she pursued appellant Lloyd Clark to get him involved in the Kids program, he never became involved. Holmes testified that appellant Clark has another child in the Kids program and that he was not involved with that child in the program either.
 {¶ 18} The next witness to testify was Camille Lindon, an outpatient counselor at Community Mental Healthcare. Lindon testified that she first began treatment with appellant Connie Blunt in January of 2001 and that she had met with Connie once or twice a month. Lindon testified that Connie had gone to jail to visit her then husband, Albert Blunt, Jr. who has been convicted multiple times of domestic violence. Lindon indicated that she had voiced her concerns to Connie about such visit and that "we talked about perhaps that was, you know, maybe a better place than meeting him elsewhere." Transcript of July 25, 2002, hearing at 91. Lindon testified that Connie had a pattern of returning to Albert Blunt after the incidents of domestic violence and that Connie, at times, "would tend to minimize that domestic violence." Transcript of July 25, 2002, hearing at 96.
 {¶ 19} At the hearing, Debbie Whitney, a family service aide with Job and Family Services, testified that he has been involved with appellant Connie Blunt's three minor children since November 7, 2001. According to Whitney, Connie, who has one hour visits once a week with her children, has regularly attended the visits and had only missed one visit when, because she was fifteen minutes late, the visit was cancelled in accordance with Agency policy. While, during the initial visits, the children had behavioral problems and Whitney was concerned with Connie's ability to control her children, Whitney testified that there had been improvement and that Connie was more in control of the children's behavior. During Connie's early visits with her children, Whitney noticed that Connie had problems interacting with all three children at once and that Christine was not getting "any attention at all." Transcript of July 25, 2002, hearing at 110. When asked whether there was ever a time when Connie's behavior concerned her, Whitney responded as follows:
 {¶ 20} "A. Um, yeah, on a couple occasions I felt that, um, Connie was displaying almost childlike behaviors. Towards the end of the visit she would get a pouty look on her face and start to appear a little depressed that the visit was ending and I thought that that kind of brought the kids down a few times.
 {¶ 21} "Q. Okay, you sort of saw that having an impact on the children, would that be correct?
 {¶ 22} "A. Yeah." Transcript of July 25, 2002, hearing at 112. Although, as is stated above, there had been improvement in Connie's visits with her children, Whitney testified that she did not want to lengthen the amount of visits since she was concerned "over Connie's consistency and I just am still a little wary that she can maintain beyond that one hour." Transcript of July 25, 2002, hearing at 114. Whitney further testified that, based on her observations of Connie during the visits, she had concerns over Connie's ability to control the childrens' behavior if she was a full time care giver.
 {¶ 23} On cross-examination, Whitney acknowledged that Connie is very affectionate towards her children and often hugs them and tells them she loves them. Whitney further testified that this behavior was consistent for Connie throughout her visitation, but is gaining in frequency. Whiney also acknowledged that, because Albert Blunt, Jr., has many behavioral problems, it would be difficult for anyone to handle him in the visitation room. The following is an excerpt from Whitney's testimony:
 {¶ 24} "Q. So you would agree it would be difficult for any individual to be able to handle and to deal with Ace [Albert] in particular, not just Connie having difficulty, but any of us may have difficulty if we were in that visitation room with Ace?
 {¶ 25} "A. Um, I think it would be, it would require great effort, it is what I think.
 {¶ 26} "Q. On anyone's part?
 {¶ 27} "A. Yes.
 {¶ 28} "Q. Alright. And you've indicated in your monthly reports that Connie is appropriate and consistent in how she responds to Ace's behaviors?
 {¶ 29} "A. Yeah.
 {¶ 30} "Q. Do you agree with that?
 {¶ 31} "A. Um, yes, they've improved and gotten to consistency in responding to him quickly.
 {¶ 32} "Q. Alright, and the date of the report that I was looking at specifically was in January of 2002, where you indicated that Connie was appropriate and consistent?
 {¶ 33} "A. Yes. Um, basically from, throughout the life of the monitored visits, we have had good days and we've had bad days, and, you know, they would fluctuate so frequently, you know, we would have one that was just, you know, chaos.
 {¶ 34} "Q. Alright, but you're not attributing that specifically to Connie, or saying that that's her fault that the visit wasn't, did not go well? A lot of times the children were wound up when they came in for the visitation?
 {¶ 35} "A. Um, yeah, a lot of times they were wound up.
 {¶ 36} "Q. And you would agree that Connie did her best?
 {¶ 37} "A. At times." Transcript of July 25, 2002, hearing at 129-130.
 {¶ 38} At the hearing, Whitney testified that she provided parent education services and supervised visits for appellant Lloyd Clark. With respect to the parent education services, Whitney testified that Clark did not attend the same consistently because of problems with his work schedule and that, although the education sessions were switched, Clark's attendance did not improve. Whitney, who has been monitoring visits for appellant Clark since November 15, 2001, corroborated the details of the incident at Clark's home on June 20, 2002, when Tara Hopper, Clark's live-in girlfriend, verbalized frustration and disappointment over the way things had taken place during a visit with Albert at the house. As a result, visitations were moved back to the Agency. Appellant Clark, according to Whitney, was sometimes not prompt for visitations that Whitney supervised at Job Family Services and, during one visit, fell asleep. While appellant Clark and his son, Albert, relate to each other "very lovingly", Whitney testified that there was "minimal" one-on-one activity between the two. Transcript of July 25, 2002, hearing at 122.
 {¶ 39} During examination by the Guardian Ad Litem, Whitney testified that the behavior of all three children had improved significantly since they were placed in foster care.
 {¶ 40} The next witness to testify at the July 25, 2002, hearing was Beth Bertini, the on-going case manager for Tuscarawas County Job Family Services. Bertini testified that, after the children were removed from the home, they were in the temporary custody of their grandmother, Elaine Yeager, until November of 2001 when Yeager no longer wanted custody. All three children were, as of the date of the hearing, placed together.
 {¶ 41} Bertini testified that the case plan for appellant Connie Blunt required her to continue counseling through Community Mental Healthcare, to deal with ways to protect her children and learn how they are affected by domestic violence, to have no contact with Albert Blunt, Sr. and to complete a psychological evaluation and follow all recommendations. The case plan was later amended to require appellant Connie Blunt to complete parent education with Sally Homes, to continue taking her medication and to maintain stable housing. Bertini testified that she was satisfied that appellant Connie Blunt had complied with the counseling requirement, that Connie had completed parent education through the Tots program, and that Connie had taken her medication as directed. Bertini testified that Connie, who was having difficulty finding and maintaining housing, was living at the time of the hearing in a trailer with Perry Yeager, a brother of her mother's husband who has a history with Job Family Services, and that just prior to such time, Connie had been staying at campgrounds. Prior to the campground, the Agency had assisted Connie in obtaining an apartment. However, appellant Connie Blunt only stayed in the apartment from February until May, when she left over concerns that the apartment was too small. The following testimony was adduced when Bertini was asked if she knew where Connie lived prior to the apartment:
 {¶ 42} "A. I was never, I was never really sure. She did live with her sister, Tammy, in Dennison for a period of time, um, in the beginning of the case and periodically she was living different places that I wasn't really sure of, but I know that there were times she indicated that I should send mail to her mother's house, that she would pick her mail up there, so I was really unsure of where she was at.
 {¶ 43} "Q. You indicated that the Agency assisted her with a deposit and a first month's rent at the apartment in Dennison Woods, is that correct?
 {¶ 44} "A. Yes, that's correct.
 {¶ 45} "Q. Is that the only time the Agency has ever helped her to obtain housing?
 {¶ 46} "A. No. There was a prior case that I had with Connie, I believe it was '98, '99, that we assisted with first month's rent and deposit, and I believe the Agency assisted Connie with deposit and rent for North Carolina, I believe is what I read in the records.
 {¶ 47} "Q. Okay, you weren't directly involved with that?
 {¶ 48} "A. No, I was not directly involved with that." Transcript of July 25, 2002, hearing at 145-146. Bertini indicated that she was not satisfied with Connie's compliance with the housing requirement and that she had no idea where Connie's current residence was or if it was suitable.
 {¶ 49} Bertini further testified that she had concerns over appellant Connie Blunt's ongoing contact with Albert Blunt, Sr. In addition to Connie's admitted contact with Albert Blunt at the jail, Bertini testified that Job Family Services staff members reported seeing the two together twice in Kmart. While Connie denied that one of the incidents occurred, she claimed that the other time she ran into Albert Blunt, Sr. When asked, Bertini testified that she had concerns over returning custody of the children to Connie since she was not confident that Connie would be able to protect the children from domestic violence and since she did not know if Connie had stable housing. Berrtini testified that, based on her concerns, the children should not be returned to Connie.
 {¶ 50} Bertini further testified about the case plan formulated for appellant Lloyd Clark. The plan, according to Bertini, required Clark and Tara Hopper, his live-in girlfriend, to complete parent education, to become involved with Sally Holmes of Community Mental Health Care to learn to deal with Albert's behavioral problems and to attend the group for Albert Blunt, Jr. at the same. In addition, the plan required appellant Clark to have a drug and alcohol assessment and to follow all recommendations and to complete a psychological evaluation, Bertini testified that Clark completed the drug and alcohol assessment and followed all recommended treatment and that he underwent a psychological evaluation, although the evaluation was not performed until after the motion for permanent custody had been filed. According to Bertini, appellant Clark never attended the group at Community Mental Health Care or had any contact with Sally Holmes. When asked about her concerns about returning custody of Albert to appellant Clark, Bertini testified as follows:
 {¶ 51} "A. My concerns on that is that Tara has vacillated back and forth whether she wants Ace in her home or not. There's also issues between Lloyd and Tara based on the fact that he has three children that are very close in age and there's some infidelity issues there, and, um, Lloyd I have watched him in the office, um, when Tara starts discussing the concerns and stuff that she wants to address I've watched Lloyd basically shut down and just, jut like shut it out.
 {¶ 52} "Q. Okay. Any part of your concerns about Ace being placed with his father, does this have to do with Ace's particular problems of his own?
 {¶ 53} "A. Um, I know in the parent education there was a lot that Tara had indicated that she didn't feel she needed parent education, she felt that she parented her children, that Ace needed to change his behaviors, so my concern was, and still is, that he would get the structure that he needs to deal with his issues." Transcript of July 25, 2002, hearing at 155-156.
 {¶ 54} Bertini also testified that the Agency had expended reasonable efforts to reunify the children with either or both of their parents and that a grant of permanent custody would be in their best interest.
 {¶ 55} The Guardian ad Litem, in a report filed on July 25, 2002, recommended that permanent custody be granted to Tuscarawas County Job Family Services. The Guardian ad Litem, in her report, noted that, the children had been continually exposed to "the continual and persistent domestic violence by Albert Blunt". The Guardian ad Litem also voiced concerns over Connie's inability to maintain adequate housing "for any length of time" and her continued contact with Albert Blunt, Sr. despite a no contact order. With respect to appellant Lloyd Clark, the Guardian ad Litem indicated that Albert has significant behavioral problems and special needs "due to the length of time he spent in the home situation with his mother" and that Albert required "substantial one-on-one time with his caregivers." While the Guardian ad Litem, in her report, indicated that he did not believe that appellant Clark was given adequate time to complete his services, she noted that "[e]ven if this case was prolonged to give Mr. Clark more time, the undersigned would be resistant to feel this would change any of the dynamics that go along with the integration of Ace into the Clark household." The Guardian ad Litem further indicated that the children were flourishing in foster care.
 {¶ 56} Subsequent to the July 25, 2002, hearing, the trial court, as memorialized in a Judgment Entry filed on August 26, 2002, granted the motion for permanent custody. The trial court, in its entry, stated, in part, as follows:
 {¶ 57} "Based upon the information presented at this hearing, it is clear that these children, and in particular, Ace, cannot wait for their parents to improve their parenting skills. While Connie Blunt and Lloyd Clark verbalize dedication to these children, their collective actions are to the contrary. The needs of Ace are too great and he is too fragile to be placed in the hands of any adult with questionable parenting skills that will only exacerbate his difficulties. The young age of the remaining two children may have insulated them from some trauma, but as Connie Blunt is their only known parent, her prognosis makes eventual trauma for these two children imminent if they are returned to her care.
 {¶ 58} "Based upon the facts presented at the evidentiary hearing and the written recommendation of the Guardian ad Litem, the Court finds that Albert (Ace), Dakota, and Christine Blunt cannot and should not be placed with either parent within a reasonable time. This evidence supports a finding that despite diligent, reasonable efforts and planning by the Tuscarawas County Job and Family Services to remedy the problems which caused removal of the children, both parents have failed to continually and repeatedly for a period of six months or more to substantially remedy the conditions causing removal."
 {¶ 59} Following an appeal, all parties agreed to retry the matter based on a service failure on Elaine Corbin[4]. For such reason, the request for permanent custody was refiled and a hearing on the same was held on May 30, 2003. The transcript of the first permanent custody hearing was admitted into evidence at such hearing upon stipulation of the parties.
 {¶ 60} At the May 30, 2003, hearing, Harold Keesee, who had been a foster parent to the three children for approximately 18 months, testified that, when the three children first came into his home, they were "pretty wild" but had since "come a long way." Transcript of May 30, 2003, hearing at 9. Keesee testified that when Dakota saw his mother while out with his foster mother picking up pizza, he had an adverse reaction and, for several days, stood looking out of the door while saying that he was looking for his mother, who he referred to as "bad Connie." Transcript of May 30, 2003, hearing at 15. On another occasion, Albert ran into his mother while downtown and was afraid that she would come and take him. After seeing his mother that time, Albert was very nervous and shaky and had problems with defecating.
 {¶ 61} Beth Bertini also testified at such hearing. Bertini testified that the children were doing well in foster care and that, based on other incidents, she still had concerns about the children being placed back with Connie. According to Bertini, in January of 2003, Connie was criminally charged after becoming intoxicated and spitting on a police officer. Additionally, after she took her 13 or 14 year old niece who was in the custody of Job Family Services, to a tattoo parlor and signed papers allowing her niece to get her tongue pierced, appellant Connie Blunt was criminally charged. Bertini also testified that appellant Lloyd Clark, prior to the permanent custody hearing, had been arrested for DUI. According to Bertini, individuals who had some previous relationship with the children had expressed interest in adopting them. Once again, Bertini testified that permanent custody would be in the childrens' best interest.
 {¶ 62} As memorialized in a Judgment Entry filed on June 5, 2003, the trial court again granted the motion for permanent custody, finding that appellants had "demonstrated a lack of commitment toward their children and have failed to provide an adequate home for the children at this time and cannot do so within a year of this litigation."
 {¶ 63} On July 3, 2003, appellant Lloyd Clark filed an appeal (Case No. 2003 AP 07 0053) from the trial court's June 5, 2003, Judgment Entry, raising the following assignment of error:
 {¶ 64} "WHEN A RECORD SHOWS THAT A PARENT HAS `CERTAINLY INVOLVED HIMSELF IN CASE PLAN SERVICES AND HAS BEEN WILLING TO DO THE THINGS THAT WERE ASKED OF HIM, IT IS IN THE BEST INTEREST OF THE CHILD TO DENY THE MOTION OF THE JOB AND FAMILY SERVICES FOR PERMANENT CUSTODY AT LEAST TO GIVE REUNIFICATION SERVICES ADEQUATE TIME TO SUCCEED OR FAIL."
 {¶ 65} Appellant Connie Blunt filed an appeal (Case No. 2003 AP 07 0055) from such entry on July 7, 2003, raising the following assignment of error:
 {¶ 66} "THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO JOB AND FAMILY SERVICES; AS JOB AND FAMILY SERVICES FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT THE GRANT OF PERMANENT CUSTODY WAS IN THE BEST INTERESTS OF THE CHILDREN AND THAT THE CHILDREN COULD NOT OR SHOULD NOT BE PLACED WITH THE MOTHER WITHIN A REASONABLE PERIOD OF TIME; AND SAID DECISION WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."
 {¶ 67} These cases come to us on the accelerated calendar. Appellate Rule 11.1, which governs accelerated calendar cases, provides, in pertinent part: (E) Determination and judgment on appeal. The appeal will be determined as provided by App.R. 11. 1. It shall be sufficient compliance with App.R. 12(A) for the statement of the reason for the court's decision as to each error to be in brief and conclusionary form. The decision may be by judgment entry in which case it will not be published in any form.
 {¶ 68} These appeals shall be considered in accordance with the aforementioned rule.
 {¶ 69} Appellants, in their separate assignments of error in their separate cases, argue that the trial court's findings that the children could not or should not be placed with either parent within a reasonable time and that the grant of permanent custody was in the childrens' best interest were against the manifest weight and sufficiency of the evidence.
 {¶ 70} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. (1978), 54 Ohio St.2d 279,376 N.E.2d 578.
 {¶ 71} R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:
 {¶ 72} "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section2151.353 * * * of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 * * * of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 {¶ 73} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."
 {¶ 74} In the case sub judice, testimony was adduced that appellant Connie Blunt had failed to secure stable housing and that she continued to have contact with Albert Blunt, who has a history of domestic violence, despite a no contact order, thereby placing her own children at risk. Testimony also was adduced that, due to her mental health problems, appellant Connie Blunt has difficulty providing appropriate parenting to her children. With respect to appellant Lloyd Clark, testimony was adduced that Clark was unable to address Albert's special needs and failed to become involved in Albert's counseling, although ordered to do so. As noted by appellee, testimony was also adduced that there was concern over "the ability of Albert, Jr. to be successful in the home of Mr. Clark given the functioning of his current family and their approach to Albert, Jr."
 {¶ 75} Thus, there was competent and credible evidence that both appellants had failed to remedy the problems that initially caused the children to be removed from the home.
 {¶ 76} As is stated above, appellants also contend that the trial court's finding that the granting of permanent custody is in the childrens' best interest is against the manifest weight and sufficiency of the evidence.
 {¶ 77} Under R.C. 2151.414(D), in determining the best interest of a child, the trial court shall consider the following factors:
 {¶ 78} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 79} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 80} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 81} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 82} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 83} Testimony was adduced at the permanent custody hearings that the children had been in the Agency's custody since November 7, 2001 and, prior to such time, had been in the temporary custody of their maternal grandmother since January 12, 2001; that Albert and Dakota had adverse reactions when seeing appellant Connie Blunt in public; and that a potential adoptive home was being pursued for the children. The Guardian Ad Litem, in a report filed on July 25, 2002, recommending that permanent custody be granted to Tuscarawas County Job Family Services, noted that while the two younger children were too young to express what their desires or wishes were, Albert Blunt, Jr. "has conveyed that he would like to reside with his father, only." As noted by the Guardian Ad Litem in her report, "[t]his means that he does not want to be a part of Mr. Clark's current family unit (Tara, her girls, and their son)." Testimony was further adduced at the hearing that the childrens' behavior has improved substantially since they have been in foster care and that the children had not been negatively affected by a lack of contact with their mother.
 {¶ 84} Based on the foregoing, we find that the trial court's findings that the children could not or should not be placed with either parent within a reasonable time and that the grant of permanent custody was in the childrens' best interest were not against the manifest weight and sufficiency of the evidence. There was competent, credible evidence supporting the trial court's decision granting permanent custody of the three children to Job Family Services.
 {¶ 85} Appellants' assignments of error are, therefore, overruled.
 {¶ 86} Accordingly, the judgment of the Tuscarawas County Court of Common Pleas, Juvenile Division, is affirmed.
By: Edwards, J., W. Scott Gwin, P.J. and Farmer, J. concur.
[1] Although all three children were born while appellant Connie Blunt was married to Albert Blunt, Sr., DNA testing revealed that he is not the father of any of the children.
[2] This case represents the second significant prolonged involvement of Job Family Services with appellant Connie Blunt and her children.
[3] Albert Blunt, Jr. is known as "Ace."
[4] Maternal grandmother of the children.